Hillsborough-southern judicial district
No. 2007-423

CLARK & LAVEY BENEFITS SOLUTIONS, INC.

v.

EDUCATION DEVELOPMENT CENTER, INC.

Argued: April 10, 2008
Opinion Issued: May 2, 2008

*Getman, Stacey, Schulthess & Steere, P.A.*, of Bedford (*Andrew R. Schulman* and *Dona Feeney* on the brief, and *Mr. Shulman* orally), for the plaintiff.

*Michael J. Sheehan*, of Concord, by brief and orally, for the defendant.

GALWAY, J. The defendant, Education Development Center, Inc. (EDC), appeals, and the plaintiff, Clark & Lavey Benefits Solutions, Inc. (C&L), cross-appeals, from rulings of the Trial Court (*Groff*, J.). We affirm.

The record discloses the following facts. C&L was formed in 1997 to broker group insurance policies for companies that sponsor employee benefit plans. EDC is a not-for-profit corporation dedicated primarily to "applied research in education and public health awareness." In 1997, EDC hired C&L as its insurance broker. Pursuant to the parties' contract, C&L was paid solely from commissions built into the premiums paid by EDC to the insurance carriers it selected with C&L's help.

In 2004, EDC's benefits manager began reviewing the commissions paid to C&L, and compared the rates to the "standard" brokerage commission rates paid by its health and dental carriers. He determined that because the rates paid to C&L were higher than the "standard" rates, he would negotiate with C&L to recover the difference. Despite the parties' negotiations, and EDC's continuing use of C&L's services throughout 2004, EDC terminated C&L as its broker in 2005.

In April 2005, C&L sued EDC and EDC counterclaimed against C&L. Following trial, a jury found C&L liable to EDC for breach of a fiduciary duty and for intentional misrepresentations and awarded EDC $70,000 in damages. However, the jury also found EDC liable to C&L for breach of contract and negligent and intentional misrepresentations, and awarded C&L $112,000 in damages. After the trial ended, EDC filed a motion seeking forfeiture of all commissions C&L had earned since 1998, which the trial court denied.

EDC appeals, arguing that certain jury instructions were erroneous and that the trial court erred in denying its forfeiture motion. C&L cross-appeals from the trial court's denial of its motion for a directed verdict on EDC's claims for breach of contract and misrepresentation. We address each argument in turn.

When EDC counterclaimed, it alleged, in part, that C&L had breached the Massachusetts Consumer Protection Act (MCPA), Mass. Gen. Laws ch. 93A, by failing to disclose the "standard" brokerage commission rates paid by the carriers it selected. According to EDC, had C&L disclosed those rates, that information would have influenced EDC's decision to use C&L's services. EDC contends that the trial court erroneously instructed the jury on the elements of this claim.

■■ "The purpose of jury instructions is to identify issues of material fact, and to inform the jury of the appropriate standards of law by which it is to resolve them." *Transmedia Restaurant Co. v. Devereaux*, 149 N.H. 454, 457 (2003) (quotation omitted). We review jury instructions in context and will not reverse unless the charge, taken in its entirety, fails to adequately explain the law applicable to the case in such a way that the jury is misled. *Id.*

Relative to the MCPA claim, the trial court instructed the jury that:

> In order to recover under a claim for violation of the Consumer Protection Act, EDC must prove, one, that Clark and Lavey committed an unfair and deceptive trade practice by failing to disclose to EDC the established broker commission rates for the sale of the insurance carrier's policies; two, that disclosure of these standard commission rates may have influenced EDC not to enter into the transaction of designating Clark and Lavey as its broker for the purchase of these policies; and, three, that as a result of this conduct by Clark and Lavey EDC suffered pecuniary loss.
>
> In order to constitute an unfair and deceptive trade practice under the act, Clark and Lavey's conduct must obtain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble world of commerce or be at least within the penumbra of some established concept of unfairness or whether it is immoral, unethical, oppressive, or unscrupulous.

According to EDC, under the MCPA, the failure to disclose, in itself, is a violation and reference to the "rascality" standard was unnecessary and erroneous. Alternatively, EDC argues that if some reference to a subjective standard was proper, the "rascality" standard is not the correct standard. C&L counters that the issue has not been preserved for appeal, or, if it has, the instruction was not erroneous.

■ We address first whether the argument has been preserved. "A contemporaneous objection is necessary to preserve a jury instruction issue for appellate review." *Nilsson v. Bierman*, 150 N.H. 393, 402 (2003) (quotation omitted). Without a contemporaneous objection, the trial court is not afforded the opportunity to correct an error it may have made. *Id.* "This long-standing requirement is grounded in common sense and judicial economy, and applies equally to civil and criminal matters." *Devereaux*, 149 N.H. at 457. EDC did not make, and does not contend that it made, any objection at the time the instruction was given to the jury, despite having the opportunity to do so. Instead, EDC argues that during an on-the-record conference with the trial court to discuss the instructions proposed by the trial court, it objected to the use of the "rascality" language.

During the conference, C&L raised objections to the wording of the proposed instruction, and, after some discussion, the parties agreed to work out an instruction to submit to the court. The parties, however, could not agree on an instruction and further discussed the matter with the trial court. The following discussion ensued between the trial judge and EDC's counsel:

[EDC]: As it's been presented, Your Honor, I think the difference is whether we're going to go from the definition from the CMR [Code of Massachusetts Regulations] to the information about rascality and then the application to the facts. What I've suggested is that we go the CMR definition and then say EDC must prove, and use the language that you've already given us, and then say in addition you must find that this behavior reached a level of—to use the word—rascality from the thing such that would shock the conscience, and then you can find that—*what worries me is that we insert that term which EDC doesn't agree is applicable in the failure to disclose context before we've applied the CMR regulation to the facts.*

THE COURT: I guess I'll come up with something then.

(Emphasis added.) The issue was revisited later in the discussion during the following interaction:

THE COURT: And what—what you want is this rascality stuff down back where it belongs; right?

[EDC]: Yes, Your Honor. And I was proposing as—you know, just as an alternative that you say in addition to finding the above—I think that CMR thing is a gating question, and then you also have to find something. I don't think we—

THE COURT: All right.

[EDC]:—we agree that that's the appropriate language, but at least we're willing to live with it.

THE COURT: Well, I'll write something up, and everybody will live with it, I guess.

[EDC]: Yes, we will. Thank you.

EDC contends that these statements were sufficient to record its objections to the instruction, and does not point to any place in the record where any other objection was made. We do not agree that EDC raised an objection sufficient to preserve the issue for our review.

First, to the extent EDC could be said to have raised an objection, such objection appears to be to the order in which the portions of the instruction would be given, and not to the inclusion of the "rascality" language. Indeed, it appears the trial court so understood the objection as evidenced by the judge attempting to clarify that EDC wanted "this rascality stuff down back where it belongs." Thus, it was the placement of the language in the instruction upon which the trial court based its decision, and not the language itself. *See id.* at 458 (trial judge ruled upon what it understood the

objection to be, and it was clear from the record that the objection claimed on appeal was not the one upon which the trial court ruled).

■ Additionally, the trial court concluded by stating that it would craft an instruction to be delivered later. As such, any objections arguably raised by EDC were to the proposed instructions, which the trial court made clear were not final. EDC did not object to the instruction the trial court ultimately delivered. For these reasons, we conclude that EDC did not make an objection sufficient to preserve the matter for appeal.

■ EDC contends that even if it did not preserve the issue, we may still consider it under our plain error analysis. *See* SUP. CT. R. 16-A. C&L contends, relying upon federal law, that plain error review of the jury instruction is not available because EDC made a "true waiver" by intentionally relinquishing a known right. *See, e.g., Chestnut v. City of Lowell*, 305 F.3d 18, 20 (1st Cir. 2002); *United States v. Olano*, 507 U.S. 725, 733 (1993). In the plain error context, however, we have not adopted the "true waiver" analysis, and C&L does not argue that we ought to do so here. Accordingly, we express no opinion on whether EDC made a "true waiver" of the plain error argument, and we will consider whether the trial court's instruction constituted plain error.

■ The plain error rule allows us to consider errors not brought to the attention of the trial court. *Cloutier v. City of Berlin*, 154 N.H. 13, 25 (2006). However, the rule should be used sparingly, its use limited to those circumstances in which a miscarriage of justice would otherwise result. *Id.* "For us to find error under the rule: (1) there must be an error; (2) the error must be plain; (3) the error must affect substantial rights; and (4) the error must seriously affect the fairness, integrity or public reputation of judicial proceedings." *Id.* (quotation omitted). Here, even assuming the trial court's instruction was in error, we do not find the error plain.

■ ■ We have recently stated that in the context of our plain error analysis, "plain" is synonymous with "clear" or, equivalently, "obvious." *State v. Lopez*, 156 N.H. 416, 424 (2007). An error is plain if it was or should have been "obvious" in the sense that the governing law was clearly settled to the contrary. *Id.* "Generally, when the law is not clear at the time of trial, and remains unsettled at the time of appeal, a decision by the trial court cannot be plain error." *Id.* (quotation omitted).

■ Citing *Massachusetts Employers Insurance Exchange v. Propac-Mass, Inc.*, 648 N.E.2d 435, 438 (Mass. 1995), EDC contends that the trial court's instruction was plainly erroneous because the Massachusetts Supreme Judicial Court abandoned the use of the "rascality" analysis in

MCPA cases in 1995. Although in *Propac-Mass* the Supreme Judicial Court stated that it found phrases such as "level of rascality" to be "uninstructive," *id.*, it stopped short of abandoning the term. As a result, federal courts applying Massachusetts law have continued to use the "rascality" analysis. *See J.E. Pierce Apothecary v. Harvard Pilgrim Health*, 365 F. Supp. 2d 119, 143 n.13 (D. Mass. 2005); *see also Boyle v. Douglas Dynamics, LLC*, 292 F. Supp. 2d 198, 218 (D. Mass. 2003). Moreover, as pointed out by C&L, some Massachusetts trial courts, despite the opinion of the Supreme Judicial Court, have continued to rely upon the "rascality" standard. *See, e.g., AAA Climbers, Inc. v. Above Grade Dev. Corp.*, No. Civ. 04-483, 2007 WL 2935412, at *3 (Mass. Super. Ct. 2007); *Winlake II, Inc. v. Mercier*, No. MICV20050043C, 2006 WL 1360855, at *9 (Mass. Super. Ct. 2006). While EDC contends that such reliance is "misguided" because those courts "erroneously include[d] the rascality language," it suffices to demonstrate that the law in Massachusetts is not clearly settled. As the law is not clearly settled, we cannot say that including the language in the jury instruction amounted to plain error.

The parties' remaining claims on appeal relate to the contention that C&L breached a fiduciary duty owed to EDC. C&L argues that it did not owe a fiduciary duty to EDC, and, therefore, the trial court erred in denying its motion for a directed verdict. EDC argues that following the jury's determination that C&L breached its fiduciary duty, the trial court erred in denying its motion for forfeiture.

Prior to closing arguments, C&L moved for a directed verdict arguing, in part, that the evidence showed the parties to have an ordinary commercial relationship. Therefore, C&L contended, it did not owe EDC a fiduciary duty. The trial court denied the motion because it concluded that a reasonable jury could find that such a duty existed.

"A trial court may grant a motion for a directed verdict only if it determines, after considering the evidence and construing all inferences therefrom most favorably to the non-moving party, that no rational juror could conclude that the non-moving party is entitled to any relief." *Ward v. Inishmaan Assocs. Ltd. P'ship*, 156 N.H. 22, 24 (2007) (quotation omitted). The trial court may not weigh the evidence or judge the credibility of witnesses and should deny the motion for a directed verdict unless it can affirmatively determine that the plaintiff is not entitled to any relief on the evidence presented. *Emerson v. Bentwood*, 146 N.H. 251, 253 (2001). "We will uphold a trial court's ruling on a motion for a directed verdict when the record supports the conclusion that the trial court did not commit an unsustainable exercise of discretion." *Ward*, 156 N.H. at 24 (quotation omitted).

In this state, "fiduciary relationship" has been defined comprehensively, and exists wherever influence has been acquired and abused or confidence has been reposed and betrayed. *Brzica v. Trustees of Dartmouth College*, 147 N.H. 443, 447 (2002). A fiduciary relationship exists between two persons when one has gained the confidence of the other and purports to act or advise with the other's interest in mind. *Id.* at 447-48. "Once a person becomes a fiduciary, the law places him in the role of a moral person and pressures him to behave in a selfless fashion while contract law does not go beyond the morals of the market place where self-interest is the norm." *Id.* at 448.

C&L argues that insurance brokers do not, generally, owe a fiduciary duty to their clients. More specifically, C&L contends that the parties' relationship was that of an ordinary broker and client, bound by the norms of contract law, and not a fiduciary relationship requiring it to act in the interests of EDC. According to C&L, there is no evidence that it performed differently than any other insurance broker or that by its actions it created a fiduciary relationship. C&L argues that any representations it made were mere advertising puffery that cannot, as a matter of law, create a fiduciary relationship.

EDC does not argue that insurance brokers, as a general matter, owe fiduciary duties to their clients; nor does it argue that such a relationship would exist in all cases. EDC contends only that in this case, there was sufficient evidence of a fiduciary relationship that the trial court did not err in denying C&L's motion for a directed verdict.

We observe first that during discussions about the jury instructions prior to the close of the evidence, C&L's counsel conceded that when C&L advertised that it owed a "fiduciary responsibility" to its clients, such advertising "might create a question of fact for the jury." He further stated that "the jury would need to determine whether they're just an insurance broker or an insurance broker plus." Thus, prior to moving for a directed verdict, C&L acknowledged that its advertising materials could create a question for the jury about the existence of a fiduciary relationship.

Furthermore, while C&L's advertising, in itself, might not be enough to demonstrate the existence of a fiduciary relationship, C&L's president, Paul Clark, testified that he understood the use of the term "fiduciary" in his company's advertising materials to mean that C&L would put its clients' interests first. He then testified to several instances when C&L placed the welfare of EDC before its own interests. Further, EDC's former director of human resources, Christine Connors, testified that at the time C&L was hired, she understood it was supposed to work for EDC's best interests, and that EDC relied upon C&L to disclose everything it

needed to know about its insurance needs. We believe this evidence and the inferences therefrom, considered most favorably to EDC, would be sufficient for a rational juror to conclude that C&L had a fiduciary relationship with EDC. Accordingly, the trial court's denial of C&L's motion for a directed verdict was not an unsustainable exercise of discretion.

Finally, EDC argues that the trial court erroneously denied its post-trial motion for forfeiture. In that motion, EDC argued that since C&L was determined to have breached a fiduciary duty, it was not entitled to any of the commissions it had earned from EDC's contracts since 1998.

In its pleadings, EDC did not raise a specific claim for forfeiture of all commissions earned by C&L. Further, during trial EDC maintained that the damages it sought from C&L were for the difference between the commissions paid to C&L, and those which would have been paid pursuant to the "standard" rates. In fact, in its closing arguments to the jury, EDC argued that it was seeking only the difference between the "standard" commissions and those actually paid to C&L. EDC did not request an instruction on the issue of forfeiture, and did not object to the lack of such an instruction. Only after the trial had ended did EDC claim that it was entitled to recover such damages. Accordingly, C&L was never put on notice that it had to defend against such a claim. In these circumstances, we conclude that the trial court did not err in denying EDC's post-trial forfeiture motion. *See Thompson v. C&C Research & Dev.*, 153 N.H. 446, 451-52 (2006).

*Affirmed.*

BRODERICK, C.J., and DUGGAN and HICKS, JJ., concurred.