UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Northeast Credit Union,
      Plaintiff

      v.                                    Civil No. 09-cv-88-SM
                                            Opinion No. 2010 DNH 089
CUMIS Insurance Society, Inc.,
      Defendant


O R D E R


In an action removed from the New Hampshire Superior Court, Northeast Credit Union ("Northeast") seeks a declaratory judgment, pursuant to N.H. REV. STAT. ANN. § 491:22, that it is entitled to coverage under a Credit Union Bond ("Bond") issued by CUMIS Insurance Society, Inc. ("CUMIS").  Before the court is defendant's motion for summary judgment.  Plaintiff objects.  For the reasons given, defendant's motion for summary judgment is granted.


**Summary Judgment Standard**

A summary judgment motion should be granted when the record reveals "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).  "The object of summary judgment is to 'pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required.' "  Dávila

v. Corporación de P.R. para la Diffusión Pública, 498 F.3d 9, 12 (1st Cir. 2007) (quoting Acosta v. Ames Dep't Stores, Inc., 386 F.3d 5, 7 (1st Cir. 2004)). When ruling on a party's motion for summary judgment, a trial court "constru[es] the record in the light most favorable to the nonmovant and resolv[es] all reasonable inferences in [that] party's favor." Meuser v. Fed. Express Corp, 564 F.3d 507, 515 (1st Cir. 2009) (citing Rochester Ford Sales, Inc. v. Ford Motor Co., 287 F.3d 32, 38 (1st Cir. 2002)).

## Background

In August, 2007, Northeast retained Warranty Title Company, Inc. ("Warranty Title") to provide various services in connection with a real-estate closing for two of its members, Lenare and King Sanborn, who were refinancing their mortgage. Warranty Title was owned and operated by its President and General Counsel, Robert Steuk, who at the time was a member of the New Hampshire bar. (Steuk has since been disbarred in New Hampshire.)

In preparation for the Sanborn closing, Northeast wired $188,000 to Warranty Title and, in turn, Warranty Title issued three post-closing checks to Northeast. When Northeast presented those checks for payment, all three were returned for

insufficient funds.  Northeast attempted to recoup its losses by making a claim on the Bond covering losses occasioned by acts of dishonesty by its directors and employees.  CUMIS denied coverage.

Northeast made its claim under that section of the Bond issued by CUMIS providing coverage for "loss[es] resulting directly from dishonest acts committed by an 'employee . . . .' " (Def.'s Mot. Summ. J., Ex. A, at 12.)  The Bond contains an extensive definition of the term "employee," including the following provision, on which Northeast based its claim: "For Employee Or Director Dishonesty Coverage only, 'employee' also means . . . [r]etained attorneys and their staff <u>only while performing legal services for you</u>."  (<u>Id.</u> at 31 (emphasis added).)

## Discussion

Northeast petitions for a declaratory judgment that it is entitled to coverage under the Bond for losses resulting from Warranty Title's misappropriation of the escrowed funds it should have disbursed back to Northeast in connection with the Sanborn refinancing.  CUMIS moves for summary judgment, arguing that under the definition in the Bond, Warranty Title was not Northeast's employee.

The parties agree that Northeast's entitlement to coverage turns on a single question: Whether Warranty Title was Northeast's employee when it misappropriated funds intended for the Sanborn closing? CUMIS argues that Warranty Title acted as Northeast's escrow agent rather than as retained attorney, and that Warranty Title was not providing legal services when it misappropriated the escrowed funds.

Northeast counters that: (1) Warranty Title's president was an attorney, and it promoted its employees as being experienced in providing legal services; (2) the company provided Northeast with legal services in the form of real-estate closings, including the preparation of legal documents; and (3) the dishonest act in this case took place in connection with a real-estate closing. Northeast also argues that CUMIS' definition of the term "legal services," is overly restrictive, and that CUMIS incorrectly attempts to compartmentalize the services Warranty Title provided. In Northeast's view, "[t]he receipt and distribution of funds is part and parcel" of the full panoply of closing-related legal services it received from Warranty Title. Northeast's fallback position is that the relevant policy language is ambiguous and should be construed in its favor.

Because there is no factual dispute about what Warranty Title did, this case presents a question of law: Whether the term "legal services" encompasses the services Warranty Title was providing Northeast when it committed the dishonest acts that resulted in is loss?

In New Hampshire, "[t]he interpretation of insurance policy language is a question of law." Colony Ins. Co. v. Dover Indoor Climbing Gym, 158 N.H. 628, 630 (2009) (citing Godbout v. Lloyd's Ins. Syndicates, 150 N.H. 103, 105 (2003)). Courts "construe the language of an insurance policy as would a reasonable person in the position of the insured based upon a more than casual reading of the policy as a whole." Id. (citation omitted). "Policy terms are construed objectively, and where the terms of a policy are clear and unambiguous, [courts] accord the language its natural and ordinary meaning." Id. (citation omitted). "[A]bsent ambiguity, [the court's] search for the parties' intent is limited to the words of the policy." Id. (citation omitted).

Regarding ambiguity, The New Hampshire Supreme Court has explained:

> Ambiguity exists if "reasonable disagreement between
> contracting parties" leads to at least two
> interpretations of the language. Int'l Surplus Lines
> Ins. Co. v. Mfgs. & Merchants Mut. Ins. Co., 140 N.H.
> 15, 20 (1995); Trombly v. Blue Cross/Blue Shield, 120

> N.H. 764, 771 (1980).  In determining whether an
> ambiguity exists, we will look to the claimed
> ambiguity, consider it in its appropriate context, and
> construe the words used according to their plain,
> ordinary, and popular definitions.  Int'l Surplus, 140
> N.H. at 20.  If one of the reasonable meanings of the
> language favors the policyholder, the ambiguity will be
> construed against the insurer.  Id.  Where, however,
> the policy language is clear, this court "will not
> perform amazing feats of linguistic gymnastics to find
> a purported ambiguity" simply to construe the policy
> against the insurer and create coverage where it is
> clear that none was intended.  Hudson v. Farm Family
> Mut. Ins. Co., 142 N.H. 144, 147 (1997); Curtis [v.
> Guaranty Trust Life Ins. Co.], 132 N.H. [337,] 342
> [(1989)].

Colony Insurance, 158 N.H. at 630-631 (parallel citations

omitted).


Here, the court must interpret the phrase "[r]etained

attorneys and their staff only while performing legal services

for you," and, in particular, the term "legal services."  As a

starting point, the term "legal services" cannot be construed to

cover anything and everything a retained attorney might do.  If

the term were so defined, the limitation "only while performing

legal services" would impose no limitation at all.  See

Commercial Union Assur. Co. v. Brown Co., 120 N.H. 620, 624

(1980) (interpreting clause in insurance policy in manner that

gave "meaning and effect to all the language in that clause").

Under the natural and ordinary meaning of the words used in the Bond, a retained attorney performing services that are not "legal services" is not an employee. Moreover, the fact that (former) Attorney Steuk and/or Warranty Title performed all the services necessary to an effective real-estate closing for the Sanborns does not transform every service Warranty Title provided into a "legal service." Northeast is incorrect, then, in suggesting that Warranty Titles's services should not be compartmentalized. To the contrary, those services must be identified and considered separately, because, under the Bond, Warranty Title was Northeast's employee <u>only</u> to the extent it was performing "legal services."

CUMIS points out, correctly, that the policy does not specifically define "legal services." The plain meaning of that term, however, is not difficult to discern. Legal services are services that require legal training or experience, and in most cases, licensure. Northeast appears to argue that real-estate closing services, as a whole, are legal services, but that position is incorrect; many of the services a company like Warranty Title provides in connection with real-estate closings can be performed without legal training or experience or pursuant to a license to practice law. Because Northeast argues that real-estate closing services, as a whole, are legal services, it

avoids the real issue, which is whether Warranty Title's services as an escrow agent fall into the category of legal services performed by "retained attorneys and their staff" for Northeast.

Many courts have recognized the distinction between legal services and services provided by an escrow agent. See, e.g., Robertson v. ADJ P'ship, Ltd., 204 S.W.3d 484, 491 (Tex. App. 2006) (distinguishing between the fiduciary duties owed by a person providing legal services and the fiduciary duties owed by a person acting as an escrow agent); McEvoy v. Helikson, 562 P.2d 540, 542-43 (Or. 1977) (distinguishing between "negligence of an attorney in the performance of duties as an attorney and of a legal nature" and "negligence of an attorney in the performance of . . . duties of a nonlegal nature . . . [in the nature of] an escrow under which documents are to be held subject to release only in strict accordance with escrow instruction and which may be performed by an attorney"), superseded by rule on other grounds, OR. R. CIV. P. 18A, as recognized in Moore v. Willis, 767 P2d 62 (Or. 1988); Ky. Bar Ass'n v. Craft, 208 S.W.3d 245, 250 (Ky. 2006) ("In fact, Craft never charged the defendants for any of his legal services or actions as escrow agent.") (emphasis added); Chao v. Johnston, Nos. 1:06-CV-226 & 1:06-CV-227, 2007 WL 2847548, at *7 (E.D. Tenn. July 9, 2007) ("The complaints clearly allege Johnston 'provided escrow and legal services to the

Plans.' ") (emphasis added).  Similarly, a comment published with the New Hampshire Rules of Professional Conduct explains:

> The obligations of a lawyer under this Rule [Safekeeping Property] are independent of those arising from activity other than rendering legal services.  For example, a lawyer who serves only as an escrow agent is governed by the applicable law relating to fiduciaries even though the lawyer does not render legal services in the transaction and is not governed by this rule.

N.H. R. PROF. CONDUCT 1.15, 2004 ABA Model Code Cmt. [5]; see also In re Krause, 737 A.2d 874, 877-78 (R.I. 1999) (holding that attorney acting as escrow agent who took escrowed funds to satisfy seller's unpaid legal bill violated "his fiduciary duty as escrow agent").

It is well understood, moreover, that the services of an escrow agent, even when that escrow agent is an attorney, are not legal services.  As the Ohio Court of Appeals explained:

> [A]n escrow agreement contains certain conditions imposed by both parties which the escrow agent agrees to obey.  The main function of an escrow agent is to hold documents and funds until the conditions of the purchase agreement are met whereupon the escrow agent releases the documents and funds.  Thus, the escrow is a fiduciary agent for both parties to a purchase agreement.
>
> By contrast, an attorney represents one party to a purchase agreement.  An attorney owes a fiduciary relationship only to the party so represented.  Thus, the inherent natures of the two positions, viz., attorney and escrow agent, are distinct and mutually exclusive.

9

It remains for the trier of fact to determine which actions were legal services performed for Saad alone and which actions were purely escrow work performed for the benefit of both parties.  Therefore, the court erred when it determined that any alleged misconduct on the part of Weinberger and the firm would constitute legal malpractice.  Thus, summary judgment was improperly rendered.

<u>Saad v. Rodriguez</u>, 506 N.E.2d 1230, 1233 (Ohio Ct. App. 1986) (citations and footnote omitted).  The California Court of Appeals has written to similar effect:

> Defendant's role as pledgeholder was separate and distinct from his role as attorney.  In his role as pledgeholder, defendant acted simply as an escrow, holding shares of the corporation for the benefit of plaintiff until Keller had completed the payments due under the contract.  One need not be an attorney to act as pledgeholder, and <u>it is clear that one acting as a pledgeholder is not performing legal services</u>.

<u>Von Rott v. Johnson</u>, 196 Cal. Rptr. 55, 58 (Cal. Ct. App. 1983) (citation omitted, emphasis added).  In <u>Lazzaro v. Kelly</u>, 450 N.Y.S.2d 102 (N.Y. App. Div. 1982), in the context of resolving a statute-of-limitations issue, the court held that an attorney serving as an escrow agent did not have an attorney-client relationship with the entity for which he provided escrow services, <u>id.</u> at 104; <u>see also</u> <u>Int'l Strategies Group, Ltd. v. Greenberg Traurig, LLP</u>, 482 F.3d 1, 7 (1st Cir. 2007) (explaining that when ISG executed a power of attorney to John Pappalardo "authorizing him to transfer to an interest bearing escrow account any funds belonging to ISG that he succeeded in

recovering from Swan Trust" that "limited power of attorney did not create an express attorney-client relationship," id. (citations omitted).  Finally, in Harlandale Independent School District v. Cornyn, 25 S.W.3d 328 (Tex. App. 2000), the Texas Court of appeals explained that "[a]ttorney-client privilege . . . does not apply to communications between a client and an attorney where the attorney is employed in a non-legal capacity, for instance as an accountant, escrow agency, negotiator, or notary public," id. at 332 (citations omitted).

While the decisions cited above resolved a variety of legal issues, all of them, in one way or another, affirm the proposition that one acting as an escrow agent does not perform legal services.[1]  Attorneys can and do provide a wide variety of services to clients involved in real-estate closings.  Some, but not all of them are legal services.  As used in the Bond, the term "legal services" has a plain and ordinary meaning that does not include the escrow services that resulted in Northeast's

---

[1] Lapham v. Stewart, 51 P.3d 396 (Idaho 2002), might appear to stand for the opposite proposition, i.e., that one acting as an escrow agent does perform legal services, but that case is materially distinguishable.  Unlike Steuk, an attorney who owned and operated a company that handled real-estate closings, and not one alleged to have operated a legal practice, the attorney in Lapham "was not operating an escrow business separate from his legal practice," id. at 403, but, rather, had been "engaged . . . as an attorney to provide professional services in connection with [a] proposed real estate loan," id. (emphasis added).

losses. Warranty Title's responsibility to collect, hold, and properly disburse funds in connection with the Sanborn closing constituted escrow, not legal, services. Finally, because the policy language is clear, and Northeast has articulated no reasonable basis for construing the term "legal services" to include the services provided by an escrow agent, there is no ambiguity in the policy language to construe in Northeast's favor. See Colony Insurance, 158 N.H. at 630-31.

In sum, CUMIS is entitled to judgment as a matter of law that: (1) Warranty Title's dishonest act, its misappropriation of escrowed funds, was not the act of retained attorneys and their staff while performing legal services for Northeast; (2) Warranty Title was not, therefore, Northeast's employee; and (3) Northeast is not entitled to coverage under the Bond for Warranty Title's misappropriation of funds.

## Conclusion

For the reasons given, defendant's motion for summary judgment (document no. 18) is granted. The clerk of the court shall enter judgment in accordance with this order and close the case.

SO ORDERED.

_____
Steven J. McAuliffe
Chief Judge

May 24, 2010

cc:   Russell F. Hilliard, Esq.
      Daniel E. Will, Esq.
      Lauren S. Irwin, Esq.
      Bradford R. Carver, Esq.
      Derek D. Lick, Esq.
      CharCretia V. Di Bartolo, Esq.